# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49565

|  |  |  |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, Sept. 2022 Term |
| | ) | |
| v. | ) | Opinion Filed: February 8, 2023 |
| | ) | |
| GILBERTO ROMAN-LOPEZ, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Deborah A. Bail, District Judge.

The judgment of conviction is affirmed.

Eric D. Fredericksen, Idaho State Appellate Public Defender, Boise, for Appellant. Brian R. Dickson argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. Justin R. Porter argued.

_____

BRODY, Justice.

Gilberto Roman-Lopez appeals from his judgment of conviction entered after a jury found him guilty of two counts of sexual abuse of a child and three counts of lewd conduct with a minor. Roman-Lopez argues that this Court should vacate his judgment and remand for a new trial based on two instances where he contends the district court improperly admitted hearsay evidence. As a preliminary matter, Roman-Lopez challenges the proper standard of review for hearsay rulings. From this, he maintains that the State will not be able to show that the errors were harmless beyond a reasonable doubt, and that the cumulative effect of the errors deprived him of a fair trial. Apart from alleged errors at trial, Roman-Lopez maintains that remand is necessary because the district court did not redline portions of the presentence investigation

1

report it allegedly accepted. Roman-Lopez's appeal was initially heard by the Court of Appeals, which affirmed. Subsequently, we granted his petition for review to this Court. For the reasons discussed below, we affirm Roman-Lopez's judgment of conviction and decline to remand the matter to redline portions of the presentence investigation report.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

In 2015, a grand jury indicted Roman-Lopez on one count of lewd conduct with a minor and one count of sexual abuse, each involving his daughter ("Daughter"). The grand jury also indicted Roman-Lopez on an additional two counts of lewd conduct with a minor and one count of sexual abuse, each involving his daughter's childhood friend ("Friend"). The indictments arose out of allegations by Daughter and Friend, made in 2014, regarding events that had occurred roughly four to nine years prior (from 2005 to 2010). Before the indictment, in September 2014, Detective Corey Turner interviewed Roman-Lopez about the allegations. The day after the interview, Roman-Lopez absconded. Roughly five years later, in 2019, Roman-Lopez was found when he was arrested on unrelated drug charges in Colorado. Roman-Lopez was extradited to the Ada County Jail, and in late 2019, his case proceeded to trial.

During the two-day jury trial, Friend testified that between 2006 and 2010, Roman-Lopez had, more than once, rubbed her chest and vagina with his hands, put his penis between her legs near her vagina; and forced her to touch and stroke his penis with her hands and feet. After Friend testified, Daughter testified that between 2005 and 2009, Roman-Lopez had touched Daughter's chest and vagina and used Daughter's feet to stroke his penis.

When Friend was on the stand, the State sought to admit a drawing of the interior of Roman-Lopez's home that Friend had made during a Children At Risk Evaluation Services (CARES) interview in 2014. The drawing roughly illustrated the two locations where the alleged conduct involving Friend had occurred: the living room and Roman-Lopez's bedroom. After the State laid foundation for the drawing, Roman-Lopez objected to the drawing as hearsay. The district court admitted the drawing, without input from the State, after initially ruling that the drawing was "not being offered for demonstrative purposes." Shortly afterwards, when Roman-Lopez reiterated his hearsay objection, the district court again overruled it. The court reasoned that the drawing was "not hearsay" because Friend had prepared the drawing, properly identified it, and it was relevant. The State published the drawing to the jury and elicited testimony from Friend who, in turn, referenced the drawing while testifying.

Later in the trial, Detective Turner testified that during his interview of Roman-Lopez prior to the indictment, Roman-Lopez said it was possible that he had touched Friend while "playing a game" but then denied that it was possible. Detective Turner also testified that Roman-Lopez had said Friend had touched his penis with her feet "[t]wo or three times." Later, on re-direct, the State asked Detective Turner, "[a]nd regarding the playing with [Friend] and [Daughter], did he say, quote, 'my wife all the time was telling me, "hey, don't watch movies with those guys?" ' " Roman-Lopez objected that the State's question called for "[d]ouble hearsay . . . within the State's exception." In response, the State argued that the answer called for would be admissible because, "It's a quote *from the defendant* regarding him watching movies with [Friend] and [Daughter]." (Emphasis added). The district court overruled the objection, and Detective Turner responded, "Yes, he did say that."

Friend's and Daughter's respective mothers both testified during the trial. Neither mother witnessed any of the alleged conduct. However, each mother provided testimony that generally corroborated Roman-Lopez's opportunity to do what Friend and Daughter alleged. Friend's mother testified that during the time the alleged criminal conduct occurred, she and Friend lived directly across the street from Roman-Lopez, and that Daughter and Friend were best friends. Friend's mother testified that Friend spent a lot of time at Daughter's house (i.e., Roman-Lopez's house), and that she only knew Roman-Lopez from seeing him "sometimes in the driveway[.]" Friend's mother also testified that Friend first disclosed the underlying acts in 2014, roughly two years after she and Friend had moved to a new area.

Daughter's mother, also the wife of Roman-Lopez ("Wife"), testified that at the time of the allegations, she was working two jobs and, as a result, Roman-Lopez often spent time home alone with their two children (i.e., Daughter and a son). Wife testified that Friend lived in a house across the street, that Daughter was best friends with Friend, and that Friend would be over "a lot." Wife also testified that when Roman-Lopez returned home after the interview with Detective Turner, Roman-Lopez was "[f]rustrated" and said, "[y]ou pay for everything you do in this life." Wife testified that Daughter was present when Roman-Lopez returned home, and that after Daughter confronted Roman-Lopez with "something[,]" Roman-Lopez responded, "[f]orgive me[,] I didn't know I was hurting you." By the next morning, Roman-Lopez was gone and neither Wife nor Daughter saw him again until he was arrested and returned to Idaho for the underlying trial, roughly five years later.

The jury found Roman-Lopez guilty on all counts. The district court then ordered a presentence investigation report ("PSI") to be prepared for sentencing. At the sentencing hearing, the district court noted one correction it had made, and then asked the parties if they had any other corrections or changes. The State did not request any corrections or changes, but Roman-Lopez lodged a "few disagreements" with, or "corrections" to, the PSI. Specifically, Roman-Lopez disputed the language on page seven of the PSI that indicates Roman-Lopez had refused to move to a lower security dorm. Roman-Lopez did not offer testimony of his own to support his objection, nor any other evidence. The district court responded to Roman-Lopez's objection with "all right," but did not redline the disputed information in the PSI. Afterwards, the district court imposed a unified sentence of forty years, with ten years fixed and thirty years indeterminate on each of the lewd conduct counts, and a unified sentence of ten years fixed and five years indeterminate on each of the sexual abuse counts. All of the sentences were to run concurrently.

## II. STANDARD OF REVIEW

"In cases that come before this Court on a petition for review of a Court of Appeals decision, this Court gives serious consideration to the views of the Court of Appeals, but directly reviews the decision of the lower court." *State v. Purdum*, 147 Idaho 206, 207, 207 P.3d 182, 183 (2009) (quoting *State v. Oliver*, 144 Idaho 722, 724, 170 P.3d 387, 389 (2007)). Because Roman-Lopez challenges the appropriate standard of review for hearsay objections, the relevant standards of review for his challenges are set out below.

## III. ANALYSIS

### A. The district court's hearsay rulings do not constitute reversible error.

1. <u>The standard of review for hearsay objections depends on the nature of the challenge and the hearsay ruling.</u>

As a preliminary matter, we clarify the appropriate standard we use to review a hearsay objection. Until now, we have typically applied the general evidentiary standard of review to hearsay challenges, i.e., whether the trial court's decision was an abuse of discretion. *See, e.g.*, *State v. Smalley*, 164 Idaho 780, 783, 435 P.3d 1100, 1103 (2019) (applying that standard to a challenge over whether a witness was "unavailable" for purposes of an exception to the rule against hearsay in I.R.E. 804 because the issue is evidentiary in nature); *State v. Lopez-Orozco*, 159 Idaho 375, 377, 360 P.3d 1056, 1058 (2015) (noting the "unavailability" finding must be

4

supported by substantial and competent evidence); *State v. Weaver*, 170 Idaho 684, __, 516 P.3d 108, 113–15 (2022) (applying the abuse of discretion standard to a challenge involving the "then-existing state of mind" exception in I.R.E. 803(3) where the issue involved predicate factual findings and a judgment call by the trial court); *Matter of Doe I*, 170 Idaho 581, __, 514 P.3d 991, 1001 (2022) (applying the abuse of discretion standard to a challenge involving the "business records" exception in I.R.E. 803(6) where the issue involved predicate factual findings and a judgment call by the trial court on "trustworthiness and reliability.").

Under the abuse of discretion standard, we use a four-part test to examine whether the trial court: "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *State v. Herrera*, 164 Idaho 261, 270, 429 P.3d 149, 158 (2018) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

On appeal, Roman-Lopez contends the appropriate standard of review for his two hearsay challenges is de novo—not abuse of discretion. Roman-Lopez makes two interrelated points. First, he maintains that whether evidence, in the first instance, meets the definition of "hearsay" under Idaho Rule of Evidence 801(c) is a question of law similar to the question of relevancy; thus, hearsay should be subject to the same de novo standard of review as relevancy. Second, Roman-Lopez maintains that whether evidence, in the first instance, meets the definition of hearsay does not involve predicate factual findings which would warrant deference from an appellate court. In other words, deference is not required because the appellate court sits in "exactly the same" position as the trial court. *Cf. State v. Anderson*, 164 Idaho 309, 312, 429 P.3d 850, 853 (2018) (holding deference to a trial court's findings is not required in the "unusual situation" where the appellate court has "exactly the same" evidence before it as the trial court).

This issue, and its implications, has troubled both federal and state courts. As a result, there is a wide "split of authority [. . .] on how evidentiary rulings addressing admissibility under the hearsay rule and its exceptions are to be reviewed." *State v. Saucier*, 926 A.2d 633, 639 (Conn. 2007) (alteration added). The split runs in roughly four directions: (1) a majority of jurisdictions use an abuse of discretion standard for challenges to the hearsay rule *and* its exclusions or exceptions; (2) a minority of jurisdictions use de novo for both the hearsay question, and its exclusions or exceptions; (3) a second minority uses a "hybrid" standard that

depends on whether the hearsay rule (de novo) or an exception or exclusion (abuse of discretion) is under consideration; and (4) a third minority rejects a categorical standard of review for hearsay challenges and instead examines the nature of the hearsay ruling and challenge at issue to determine what level of deference or scrutiny is warranted. *Id*. at 639–40 (cataloguing decisions from nearly every federal and state jurisdiction).

The Connecticut Supreme Court in *Saucier* adopted the fourth approach (i.e., the third minority trend), *Id*. at 641—and for good reason. The court in *Saucier* explained that the first three approaches are superficially attractive in their ease of application, and because of the many exceptions and exclusions for hearsay, an appellate court should be careful to not afford unwarranted deference, nor interference, which could occur with a rigid categorical standard:

> We recognize the superficial appeal of the aforementioned bright line rules [trends one through three, *supra*] in their ease of application, but conclude that such rules overlook the fundamentally complex nature of evidentiary rulings. We therefore decline to adopt a categorical de novo or abuse of discretion standard because application of either standard will afford unwarranted deference in some cases and unwarranted interference in others, irrespective of the differing nature of inquiries at issue depending on the type of statement and the rule of evidence implicated. Although the "hybrid" approach in our view correctly recognizes that not all claims require the same degree of scrutiny, its categorical distinctions fail to recognize that, even within the hearsay exceptions, a more nuanced approach is demanded. Rather than invoke a rule based strictly on a category, we conclude that the better approach is one adopted by other jurisdictions in which they examine the nature of the ruling at issue in the context of the issues in the case.

*Id*. at 640 (alteration added).

Indeed, after *Saucier*, the United States Court of Appeals for the Ninth Circuit in *Wagner v. County of Maricopa*, recognized—while leaving the issue unresolved—that the Ninth Circuit has inconsistently used both de novo and abuse of discretion when reviewing similar hearsay challenges. 747 F.3d 1048, 1052 (9th Cir. 2013); *see also id*. at 1054–55 (N.R. Smith, J., dissenting) (comparing and citing cases in Ninth Circuit to conclude that "[t]his circuit's case law is not entirely clear regarding whether we review de novo a district court's decision that a statement is or is not hearsay." (alteration added)).

Also, after *Saucier*, and in contrast to the Ninth Circuit's reluctance to clarify the standard in *Wagner*, the Tennessee Supreme Court removed itself from the first trend (i.e., the majority trend, *supra*) and fine-tuned its standard of review for hearsay challenges. *See Kendrick v. State* 454 S.W.3d 450, 479 (Tenn. 2015) (setting out a standard of review for hearsay rulings

6

that illustrates how the standard can change depending on the nature of the ruling and whether other rules of evidence are in play (e.g., relevancy and unfair prejudice)).

We agree that our standard of review for hearsay challenges requires refinement. However, as recognized in *Saucier*, polishing that standard to correctly reflect the complexity of hearsay rulings is not as simple as changing it to de novo review wholesale—or to a categorical "hybrid" of de novo and abuse of discretion. Instead, a more nuanced approach is required to ensure that cold records do not replace the sound discretion and judgment of trial courts where questions of law are not the crux of a hearsay challenge and ruling. Accordingly, we agree with the approach in *Saucier*, and conclude that the nature of the hearsay ruling, and challenge will determine the appropriate standard of review. To be clear, by this decision we do not jettison the standard of review we applied in *Smalley*, *Lopez-Orozco*, *Weaver*, and *Matter of Doe I*, *see supra*. Instead, we simply clarify that, moving forward, we will not reflexively apply our abuse of discretion standard when a hearsay ruling is at issue.

In this case, we are concerned with assignments of error that relate to the definition of hearsay in Idaho Rule of Evidence 801(c). Trial courts do not have the discretion to admit evidence that meets the definition of hearsay unless specifically provided for in the Idaho Rules of Evidence. I.R.E. 802; *State v. Ehrlick*, 158 Idaho 900, 922, 354 P.3d 462, 484 (2015). None of the exclusions or exceptions to the hearsay rule are at issue in this case. Thus, we deal only with whether the challenged evidence meets the definition of hearsay. That familiar definition is found in Rule 801(c):

> **(c) Hearsay.** "Hearsay" means a statement that:
>
> > (1) the declarant does not make while testifying at the current trial or hearing; and
> >
> > (2) a party offers in evidence to prove the truth of the matter asserted in the statement.

I.R.E. 801(c) (emphasis in original); *see also* I.R.E. 801(d) (defining "statements" that are "not hearsay[,]" i.e., excluded from the definition of hearsay).

Under the definition of hearsay, a " 'statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." I.R.E. 801(a) (quotations original). Broken into its component parts, trial courts and appellate courts sit in "exactly the same" position when determining whether evidence is, in the first instance, a "statement" that "the declarant does not make while testifying at the current trial or hearing[.]"

7

*See, e.g.*, *State v. Guerra*, 169 Idaho 486, 500–01, 497 P.3d 1106, 1120–21 (2021) (providing the rule for whether implied assertions are "statements" within the definition of hearsay that can be offered for the truth of the matter they assert). However, trial and appellate courts do not *always* sit in "exactly the same" position when it comes to whether the evidence is admitted "to prove the truth of the matter asserted in the statement" or for another relevant non-hearsay purpose, i.e., whether the evidence falls within—or should be taken out of—the last prong of the hearsay definition. *See* I.R.E. 801(c)(2).

For example, if a party objects to an out-of-court statement as inadmissible hearsay—and the evidence is not admitted for a relevant purpose other than its truth—then whether that evidence does or does not meet the definition of hearsay in Rule 801(c) is a pure question of law. No predicate factual findings or judgment call is required. Indeed, issuing this ruling is no different than ruling on the relevancy of evidence under Rule 401. *See State v. Garcia,* 166 Idaho 661, 669, 462 P.3d 1125, 1133 (2020) (quotations omitted and alteration added) ("The question of whether evidence is relevant is reviewed de novo[.]"). Thus, like our standard for relevancy, we review de novo a challenge to this type of hearsay ruling.

In contrast, if the out-of-court statement is admitted for a purpose other than its truth—thereby taking it outside the definition of hearsay—whether that evidence should or should not be admitted for a non-hearsay purpose requires a judgment call. *See, e.g.*, *State v. Smith*, 168 Idaho 463, 477, 483 P.3d 1006, 1020 (2021) (affirming the district court's exercise of discretion that an out-of-court statement was offered to impeach a witness' credibility and not for the truth of the matter asserted). That judgment call, separate from the issue of whether the non-hearsay purpose is first relevant, *State v. Hill*, 161 Idaho 444, 448, 387 P.3d 112, 116 (2016), is best left to a trial court's sound discretion. *See U.S. Bank Nat. Ass'n ex rel. CW Capital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S.Ct. 960, 967 (2018) ("When an issue falls somewhere between a pristine legal standard and a simple historical fact, the standard of review often reflects which judicial actor is better positioned to make the decision." (internal quotations omitted)). Thus, we will apply our abuse of discretion standard when a party challenges that judgment call.

With this explanation in mind, Roman-Lopez's two hearsay challenges require different standards of review. First, his double hearsay challenge to Detective Turner's testimony (i.e., what Roman-Lopez said his wife instructed) turns on whether Wife's instruction is a "statement" that impliedly asserts a fact capable of being proven true. Whether Wife's instruction is a

"statement" under the definition of hearsay in Rule 801(c) is a question of law. Thus, we apply de novo review. Second, the challenge to the admission of Friend's out-of-court drawing turns on whether the district court erred in admitting the drawing for a non-hearsay purpose, thereby taking the drawing outside the definition of hearsay. This challenge, like in *Smith*, asks us to question the judgment call made by the district court as to whether the drawing should have been admitted for a non-hearsay purpose. Thus, we apply our abuse of discretion standard.

2. The district court erred in admitting Wife's instruction because it was hearsay; however, the error was harmless beyond a reasonable doubt.

Roman-Lopez first challenges the district court's admission of certain testimony from Detective Turner over Roman-Lopez's double hearsay objection. The challenged testimony (read in conjunction with a question from the State), was as follows:

> [THE STATE]: Okay, and regarding the playing with [Friend] and [Daughter], *did [Roman-Lopez] say, quote, my wife all the time was telling me, hey, don't watch movies with those guys?*
>
> [DEFENSE COUNSEL]: Objection; hearsay relevance [sic].
>
> THE COURT: What's the –
>
> [DEFENSE COUNSEL]: Double hearsay, I guess, within the State's exception.
>
> [THE STATE]: It's a quote from the defendant regarding him watching movies with [Friend] and [Daughter].
>
> THE COURT: Overruled.
>
> [THE STATE]: And so –
>
> [DETECTIVE TURNER]: Yes, he did say that.

(Alterations and emphasis added.)

The first level of potential hearsay—what Detective Turner testified Roman-Lopez said—is not at issue. The parties agree that that testimony is admissible under the "party-opponent" exclusion to the definition of hearsay in Idaho Rule of Evidence 801(d)(2).

Instead, Roman-Lopez challenges the second layer of potential hearsay: that his wife said: "[H]ey, don't watch movies with those guys [referring to Friend and Daughter]." (Alterations added.) Roman-Lopez argues that based on the understanding of what constitutes a "statement" and "assertion" in *State v. Guerra*, 169 Idaho 486, 500–01, 497 P.3d 1106, 1120–21 (2021), the instruction from Wife contains an implied assertion of fact; thus, it meets the definition of hearsay under Rule 801(c). From this, Roman-Lopez argues the district court erred in admitting Wife's instruction because the State did not make an offer of proof that it: (1) was

9

offered for a relevant purpose other than its truth; (2) fell under an exclusion to the definition of hearsay in Rule 801(d); or (3) fell under an exception to the rule against hearsay in Rules 803 or 804. In response, the State argues that Wife's instruction lacks any assertion; thus, it is not a "statement" under Rule 801(a) and does not meet the definition of hearsay. The State maintains that Wife's instruction is no different than the officer's "verbal directions" in *State v. McDonald*, 141 Idaho 287, 288, 108 P.3d 434, 435 (Ct. App. 2005), or the "request" in *State v. Salinas*, 134 Idaho 362, 366, 2 P.3d 747, 751 (Ct. App. 2000). We conclude that Roman-Lopez's view is correct.

In this challenge, *Guerra* controls, and from its application, Wife's instruction meets the definition of hearsay under Rule 801(c). The general rule is that commands, instructions, and requests do not contain "assertions" of fact with a truth-value; thus, they are not "statements" under the definition of hearsay. *See, e.g.*, *McDonald*, 141 Idaho at 288–89, 108 P.3d at 435–36 (holding that instructions or commands are not "declarative" and do not have any "truth-value"); *Salinas*, 134 Idaho at 366, 2 P.3d at 751 (holding that the renter's communication to the officer was a "request" that "contained no assertion of any fact" that could be offered for the truth of some matter asserted).

However, in *Guerra*, we clarified that commands, instructions, and requests can constitute hearsay "if the circumstances and/or wording demonstrate an intent to assert[.]" 169 Idaho at 501, 497 P.3d at 1121. In *Guerra*, we held that a police officer's testimony that Guerra's medication bottle stated, "take due caution when operating a motor vehicle, heavy equipment" was hearsay because it impliedly asserted that the medication in that bottle can impair the user's ability to drive a car or use heavy equipment. *Id*.

Here, Wife's instruction meets the definition of hearsay because it contains an implied assertion of fact. Based on its wording, the challenged phrase: "[H]ey, don't watch movies with those guys[,]" communicates at least two things. First, it instructs Roman-Lopez to do something. Second, and more importantly, it impliedly asserts a fact that could be true or false: that Roman-Lopez engaged in inappropriate conduct while watching movies with Friend and Daughter. Thus, in applying a de novo standard of review, Detective Turner's testimony as to Wife's instruction constituted a second level of hearsay. Because the instruction was not admitted for a non-hearsay purpose, and the State did not offer any exception or exclusion, the district court erred in admitting it.

10

Nevertheless, we conclude that the error in admitting Wife's instruction was harmless beyond a reasonable doubt. Under the harmless error test, if a defendant establishes the existence of an error, the burden shifts to the State to show beyond a reasonable doubt that the error complained of did not contribute to the verdict rendered, i.e., that the error was harmless. *Garcia*, 166 Idaho at 673, 462 P.3d at 1137. "Harmless error is 'error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " *Id.* at 674, 462 P.3d at 1138 (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991)). To determine whether an error was harmless, the Court must weigh "the probative force of the record as a whole while excluding the erroneous evidence and at the same time comparing it against the probative force of the error." *Garcia*, 116 Idaho at 674, 462 P.3d at 1138. "When the effect of the error is minimal compared to the probative force of the record establishing guilt 'beyond a reasonable doubt' without the error, it can be said that the error did not contribute to the verdict rendered and is therefore harmless." *Id.* (quoting *Yates*, 500 U.S. at 404–05).

While the admission of Wife's instruction provided contemporaneous corroboration of Friend's and Daughter's testimony that they had previously watched movies with Roman-Lopez, the effect of the error in admitting that evidence was minimal when compared to the probative force of the record establishing Roman-Lopez's guilt beyond a reasonable doubt without the error. Friend and Daughter both testified at trial in great detail about years of sexual abuse perpetrated by Roman-Lopez. Friend's mother also testified to circumstances that mainly demonstrated Roman-Lopez's opportunity to commit the acts alleged by Friend. When Daughter testified, she corroborated Friend's testimony that Roman-Lopez would often watch movies with them in the same locations with a blanket over Friend and Roman-Lopez. As to her own experience, Daughter testified that when she was between the ages of 8 and 11 (i.e., from 2005 and 2009), she could recall Roman-Lopez touching her chest, "slipping his hand in [her] pants" to touch her vagina, and also using her feet to rub his penis while watching movies.

Wife also provided testimony that demonstrated Roman-Lopez's opportunity to commit the alleged acts and corroborated the girls' testimony. Wife testified that during the underlying timeframe, she was working two jobs and would often leave Roman-Lopez home alone with their children. Wife testified to one instance where she left work, came home, and found Roman-Lopez cuddling with Friend under a blanket in Daughter's bedroom. Wife also testified that when Roman-Lopez returned from the interview with Detective Turner in September 2014,

11

Roman-Lopez said: "You pay for everything you do in this life." Wife testified that when Daughter confronted Roman-Lopez that night, Roman-Lopez stated: "Forgive me. I didn't know I was hurting you." Wife testified that by the morning after the September 2014 interview, Roman-Lopez had fled the area without taking his phone or car.

Notably, the "principal purpose" underlying the policy behind the rule against hearsay is to assure that the veracity of a statement (assertion) is subject to testing through an adequate opportunity for cross-examination of its declarant. *State v. McPhie*, 104 Idaho 652, 655, 662 P.2d 233, 236 (1983). Here, *after* Detective Turner testified to Wife's instruction—Wife testified at trial. While she was on the stand, Roman-Lopez had the opportunity to cross-examine Wife on whether she had previously instructed Roman-Lopez to not watch movies with Friend and Daughter. Thus, while it was error for the district court to admit it, the harmlessness of the error is also evident in the fact that—unlike the problem typically caused by hearsay—Roman-Lopez was *not* deprived of an adequate opportunity to cross-examine the statement's declarant.

Finally, Detective Turner, who interviewed Roman-Lopez before he absconded, testified that Roman-Lopez admitted to watching T.V. and movies with Friend and Daughter in the living room (on the couch), and in his bedroom (on his bed). Roman-Lopez denied touching Friend, or that he made her touch his penis with her hands. However, Detective Turner testified that Roman-Lopez admitted that Friend had touched his penis with her feet "two or three times" and that "it was possible that he was intoxicated one day and [that] he just doesn't remember." Detective Turner testified that after the interview, Roman-Lopez did not show up to his scheduled shift for work and was not located again until 2019, roughly five years later.

In closing arguments, the prosecutor correctly noted that there were no prior inconsistent statements that impeached Friend's or Daughter's version of events, and that Roman-Lopez's "flight" served as evidence of his "consciousness of guilt." In sum, the minimal effect of the error of admitting Wife's instruction not to watch movies with the girls does not outweigh the probative force of the remaining evidence that established Roman-Lopez's guilt beyond a reasonable doubt, all admitted without the error. Thus, the error in admitting Wife's instruction was harmless beyond a reasonable doubt.

3. The district court did not abuse its discretion in admitting Friend's prior drawing for the non-hearsay purpose of illustrating Friend's in-court testimony.

Roman-Lopez's second hearsay challenge is aimed at the district court's admission of an out-of-court drawing of Roman-Lopez's home drawn by Friend. Because his hearsay challenge turns on whether Friend's drawing was properly admitted for a non-hearsay purpose other than the truth of the matter it asserts, the standard of review is abuse of discretion.

Friend's drawing depicts, without purporting to portray architectural exactness or dimensional accuracy, the layout of the living room and bedroom in Roman-Lopez's home:



Roman-Lopez's hearsay objection arose during the following exchange, followed by use of, and reference to, the drawing to aid Friend in illustrating her testimony to the jury:

[THE STATE]: Okay. And during that CARES interview, did you draw a picture of the interior of the home of the living room and the bedroom where this abuse occurred?

[FRIEND]: Yeah.

13

[THE STATE]: And if you saw that picture again, would you recognize that?

[FRIEND]: Yeah.

[THE STATE]: Okay. I'm going to hand you what's been marked as State's Exhibit No. 2. [Friend], do you recognize that?

[FRIEND]: Yeah.

[THE STATE]: And what is that?

[FRIEND]: A drawing of the living room and the bedroom.

[THE STATE]: Okay. And is that a true and accurate copy *of the drawing* you made during back [sic] in 2014 during that CARES interview?

[FRIEND]: Yes.

[THE STATE]: The State moves to admit and publish State's Exhibit No. 2.

[DEFENSE COUNSEL:] *Your Honor, I'm going to object seeing that was drawn outside the presence of a courtroom. I think it can stand as a statement in and of itself.*

THE COURT: She drew a map outlining the house?

[THE STATE]: Yes, the locations where this occurred.

THE COURT: Okay.

[DEFENSE COUNSEL]: She reported it—just for the record, she reported it was done in the CARES interview, which we haven't heard more about. *If the court does allow it in for demonstrative purposes?*

THE COURT: *It's not being offered for demonstrative purposes.*

[DEFENSE COUNSEL]: *So then we'll object as hearsay, Your Honor.*

THE COURT: *It's not hearsay. It was prepared by the witness. She has properly identified it, and it is relevant. The objection is overruled. It may be admitted.*

 (State's Exhibit 2 admitted.)

[THE STATE]: Permission to publish?

THE COURT: Go ahead.

[THE STATE]: [Friend], up there you have a pointer. Okay? *And I'm going to ask you to walk us through this drawing.* So starting in the living room, where is the living room?

[FRIEND]: Up here.

[THE STATE]: So on the top portion of the page?

[FRIEND]: Yeah.

[THE STATE]: And then what about the bedroom?

[FRIEND]: Right here.

[THE STATE]: And so I want to identify, starting with the living room—okay. Thank you, Madam Clerk—identify the articles that you've designated the living room.

[FRIEND]: Well, this was the couch across from the TV. This is where I and [Daughter] [sic] and the other couch was [sic] [brother]. And this is our blanket.

[THE STATE]: Okay. And the item that you identified as the couch—and it looks like it says ["]me[."] So that would be you and then [Roman-Lopez] would be next to you?

[FRIEND]: Yes.

[THE STATE]: And the blanket?

[FRIEND]: Yes.

[THE STATE]: So is that where he would cause you to rub his penis and he would touch your vagina?

[FRIEND]: Yeah.

[THE STATE]: On the couch right there?

[FRIEND]: Yeah.

[THE STATE]: Okay. And moving down into the bottom half of the page, what is that?

[FRIEND]: There is the bed where [Daughter's brother] would sit on the floor right here in front of the TV, and [Daughter] would lay on the side, and this is where [Roman-Lopez] would lay behind me.

[THE STATE]: And it looks like in this drawing [Roman-Lopez] [is] all the way against—well, as we look at it, it would be the—

[FRIEND]: On the opposite side of the bed.

[THE STATE]: And is that where you indicated he would put his penis between your legs?

[FRIEND]: Yeah.

[THE STATE]: And also cause you to rub his penis?

[FRIEND]: Yeah.

[THE STATE]: Okay. And you would be covered by a blanket?

[FRIEND]: Yes.

[THE STATE]: And then how about when he would place your feet on his penis, where would you be laying?

[FRIEND]: Down here.

[THE STATE]: Okay. So at the foot of the bed?

[FRIEND]: Yeah.

15

[THE STATE]: Next to [Daughter]?

[FRIEND]: Yeah.

[THE STATE]: Okay. And just to clarify, none of this occurred when—and so we're done with that. Thank you. None of this occurred when [Roman-Lopez's wife] was in the home?

[FRIEND]: No.

[THE STATE:] Okay. Just one moment, please. [Friend], thank you. I don't have any additional questions, but [Defense Counsel] is going to have some additional questions for you.

(Emphasis and alterations added.)

On appeal, Roman-Lopez argues that because the district court concluded the drawing was not admitted for demonstrative purposes, but for its truth, it was inadmissible hearsay. Roman-Lopez contends the district's court analysis in overruling his hearsay objection was improper because it only addressed relevance, and mere relevance does not make hearsay admissible. In response, the State maintains that the drawing, as an out-of-court diagram used to assist Friend's in-court testimony, "is not generally considered inadmissible hearsay." The State points to numerous cases from other jurisdictions that support this general proposition. In reply, Roman-Lopez contends that the State is asking this Court to deem Friend's drawing non-hearsay pursuant to "historical practice" instead of asking whether the drawing is first admissible under the Idaho Rules of Evidence. Roman-Lopez maintains that such an approach is contrary to our decision in *State v. Kralovec*, 161 Idaho 569, 574, 388 P.3d 583, 588 (2017), where we rejected the historical approach of admitting *res gestae* evidence in favor of requiring that evidence be first admissible through the Idaho Rules of Evidence.

Before the Idaho Rules of Evidence (including Rule 801) became effective on July 1, 1985, we considered out-of-court drawings, photographs, or maps—if "offered as substantive evidence, e.g., to prove the facts and details shown therein"—to be "hearsay evidence[.]" *Dawson v. Olson*, 97 Idaho 274, 280, 543 P.2d 499, 505 (1975) (alteration added). Conversely, if the same was offered or admitted for illustrative purposes as an aid to the witness' in-court testimony, we did not consider it hearsay so long as the witness (1) had personal knowledge of the information visualized therein; and (2) adopted the visualized information as their own to communicate what might be difficult to convey through words or gestures alone:

> Photographs, maps, and other drawings, are recognized as proper evidence to supplement the testimony of witnesses where the subject matter of the

16

testimony is difficult to portray without such aids, or where the jury can be given a better understanding of the physical facts with which they are concerned. Their admission is proper to illustrate the testimony. They are also regarded as a proper means of expressing the witness' testimony. That is, a witness may be unable, by means of words or gestures alone, to convey to the jury an accurate understanding or picture of the relative position of the physical objects or their physical characteristics, without the assistance of photographs or drawings. So, he may make a drawing or a photograph, or identify and adopt such drawing or photograph, made by another, as a means of portraying to the jury facts which are within his knowledge, and which he is not as well able to portray without such help.

*Id.* (quoting *McKee v. Chase*, 73 Idaho 491, 501–02, 253 P.2d 787, 792–93 (1953)); *see also Zolber v. Winters*, 109 Idaho 824, 828, 712 P.2d 525, 529 (1985) (reiterating this rule within a relevancy challenge three months after I.R.E. 801 first took effect).

For example, in *Hook v. Horner*, this Court held that the trial court properly rejected the plaintiff's attempt to admit a survey prepared in 1940, despite it being offered by the plaintiff for "illustrative purposes"—because "there [was] no intimation in either the record or the briefs" that it was introduced to help a witness "relate his testimony to the court." 95 Idaho 657, 660, 517 P.2d 554, 557 (1973). The Court reasoned that the survey was "apparently offered for no other purpose than to establish various measurements" contained within it, i.e., its truth, and was not used to portray facts within the personal knowledge of any witness. *Id.* at 660–61, 517 P.2d at 557–58. Thus, the survey was "hearsay" as an "out-of-court statement of a person not under oath and not subject to cross-examination[.]" *Id.*

Although we have not explicitly addressed this principle since the Idaho Rules of Evidence first took effect, its continuing applicability can be seen in the context of our decisions dealing with foundation and relevance. *See, e.g.*, *State v. Hall*, 163 Idaho 744, 780, 419 P.3d 1042, 1078 (2018) (quoting *Zolber v. Winters*, 109 Idaho at 8328, 712 P.2d at 529, for the above principle and holding that there was adequate foundation for the admission of reenactment photos used for illustrative purposes to aid the reenactment testimony of an expert witness); *State v. Raudebaugh*, 124 Idaho 758, 764, 864 P.2d 596, 602 (1993) (holding that a diagram of a living room, admitted for "illustrative purposes only" and offered through the testimony of a police officer with personal knowledge of the living room, was relevant and admissible to serve as a visual aid to the officer's testimony).

In addition, our pre-Idaho Rules of Evidence approach in *Dawson* and *Zolber* is consistent with the approach taken in other jurisdictions when a party objects to an out-of-court drawing as hearsay. *See, e.g.*, *Boudreaux v. State*, 631 S.W.3d 319, 336 (Tex. App. 2020) (holding that an accident site diagram, prepared out-of-court, was not hearsay where it was offered through an in-court witness who adopted it as his own based on his personal knowledge of the accident scene); *State v. Furlough*, 797 S.W.2d 631, 647 (Tenn. Crim. App. 1990) ("As long as the witness has personal knowledge of the subject matter and the diagram is accurate, drawings drafted out of court are admissible despite the hearsay rule. The in-court authentication of the drawing is the assertion permitting cross-examination of its accuracy.").

And when we turn to secondary authorities on evidence, our pre-Idaho Rules of Evidence approach is also echoed. For example, McCormick explains that demonstrative or illustrative aids may be created outside of court, or by the witness on the stand, and are generally admissible—subject to an unfair prejudice objection—under the theory that they "illustrate and explain live testimony" of what that witness is trying to describe. *See* 2 MCCORMICK ON EVID. § 214 (8th ed.). In other words, when the drawing is admitted for demonstrative or illustrative purposes, "the witness' *testimony* is the evidence and the map or diagram is merely an aid to its understanding." 29A Am. Jur. 2d *Evidence* § 981 (emphasis added). Thus, the drawing is not hearsay because it is not an out-of-court statement admitted to establish a particular fact. *See id*.

Importantly, this "must be distinguished" from admitting an out-of-court drawing for its truth as substantive evidence without it being offered to aid the testimony of an in-court witness with personal knowledge of what it depicts. *See id*. When the out-of-court drawing is admitted for its substance, "the instrument possesses within itself evidential characteristics tending to establish a particular fact[.]" *Id*. And without an in-court witness who has personal knowledge of that fact—the declarant of that fact is out-of-court, not subject to cross examination. In that context, the out-of-court drawing would meet the definition of hearsay to the extent it contains out-of-court statements offered for their truth.

In sum, an out-of-court drawing does not meet the definition of hearsay under Idaho Rule of Evidence 801(c) if it is (1) admitted for illustrative purposes; (2) the witness has personal knowledge of what is depicted; and (3) the witness utilizes the drawing to aid the understanding of testimony that may otherwise be difficult to comprehend through words or gestures alone. *See Dawson*, 97 Idaho at 280, 543 P.2d at 505. When these requirements are met, any "statements"

18

in the drawing are, in effect, indistinguishable from the witness' in-court testimony that is immediately subject to cross-examination. Accordingly, Roman-Lopez's "historical practice" argument and reliance on *Kralovec* is misplaced. When the above requirements are met, the out-of-court drawing *is* first admissible through the Idaho Rules of Evidence (subject of course to a relevancy or unfair prejudice objection) because the rule against hearsay in Idaho Rule of Evidence 802 does not bar its admission.

With this clarification, we turn to the district court's ruling. At first glance, the district court appears to have admitted Friend's drawing not for illustrative purposes under the requirements above, but for its truth. When Roman-Lopez initially objected, the district court concluded—without inquiring of the prosecutor—that Friend's drawing was "not being offered for demonstrative purposes." Roman-Lopez then objected to the drawing as hearsay, but the district court overruled the objection and admitted the drawing, using reasoning in tension with its earlier conclusion: "It's not hearsay. It was prepared by the witness. She has properly identified it, and it is relevant."

On appeal, Roman-Lopez essentially asks us to focus on the first ruling as dispositive. However, such a narrow approach would require us to blind ourselves to the surrounding record. *Cf. State v. Dunlap*, 155 Idaho 345, 364, 313 P.3d 1, 20 (2013) (explaining that jury instructions are not "judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." (citations omitted)). When we consider both rulings, and how Friend utilized the drawing to aid her testimony once the district court overruled the hearsay objection, Friend's out-of-court drawing was clearly admitted for illustrative purposes. For example, after the drawing was published, the prosecutor indicated Friend had a "pointer" she could use to "walk us through the drawing." As Friend testified, she repeatedly referred to, and incorporated, depictions in the drawing to assist the jury in understanding her overall testimony about events in the living room and bedroom. Unlike the survey offered in *Hook* to establish a fact contained therein, nothing in the record suggests the drawing was admitted to establish a fact asserted in the drawing that was not already part of Friend's in-court testimony.

In sum, the record reflects that Friend's drawing contains a visual depiction of facts within Friend's personal knowledge, and that Friend testified to those facts in-court using the drawing as a visual aid for the jury to understand her testimony. Although the district court's first ruling muddles its second ruling, when the record is viewed as a whole, the district court plainly

19

admitted Friend's drawing for the non-hearsay purpose of illustrating Friend's in-court testimony consistent with the requirements set out above. Thus, the district court acted (1) within the boundaries of its discretion, (2) consistently with the legal standards applicable to the choices available to it (i.e., the district court made a judgment call on whether the out-of-court drawing was being offered for its truth or a non-hearsay purpose), and (3) through an (albeit muddled) exercise of reason. For these reasons, the district court did not err in admitting Friend's drawing.

Because Roman-Lopez has only shown one error at trial, we do not reach his cumulative error argument. *See State v. Ahmed*, 169 Idaho 151, 169, 492 P.3d 1110, 1128 (2021) ("[A] necessary predicate to the application of the [cumulative] error doctrine is a finding of more than one error." (cleaned up) (quoting *State v. Perry*, 150 Idaho 209, 230, 245 P.3d 961, 982 (2010)).

## B. The district court did not abuse its discretion by failing to redline certain information in the PSI that Roman-Lopez disputed.

Roman-Lopez's final challenge is that the district court erred in not granting his request to redline certain information in the PSI that the district court allegedly "accept[ed]" as incorrect or unreliable. The State responds that Roman-Lopez's argument is based on a false premise because the record does not reflect the court "accept[ed]" the proposed correction; thus, the court had no duty to redline PSI and make the proposed correction. The State is correct.

"The sentencing court, in its discretion, may consider information, which would otherwise be inadmissible at trial, such as hearsay, as long as the court believes the information is reliable and the defendant has an opportunity to present favorable evidence and to explain or rebut adverse information." *State v. Granger*, 170 Idaho 136, __, 508 P.3d 335, 340 (Ct. App. 2022). "A district court's denial of a motion to strike or delete portions of a PSI is reviewed on appeal for an abuse of discretion." *State v. Molen*, 148 Idaho 950, 961, 231 P.3d 1047, 1058 (Ct. App. 2010). For the four-part abuse of discretion test, *see, Herrera*, 164 Idaho at 270, 429 P.3d at 158 (quoting *Lunneborg*, 163 Idaho at 863, 421 P.3d at 194), *supra*.

At the sentencing hearing, the district court first explained that it made a correction to the PSI to reflect that Roman-Lopez is not an American citizen. Afterwards, the district court inquired of the parties whether there were any other proposed corrections. The State did not request any additional corrections, but Roman-Lopez proposed "a few disagreements" with, or "corrections" to, the PSI—to which the district court answered, "All right":

THE COURT: . . . . Are there any changes or corrections to the presentence materials? I did think the body of the report seems to say that he is not an American citizen?

[DEFENSE COUNSEL]: That's correct, Your honor.

THE COURT: So I did make that correction. Anything from the State?

[THE STATE]: I don't think anything specific, but clearly the PSI investigator didn't understand a grand jury versus a jury trial. But I don't think anything—

THE COURT: Right.

[THE STATE]: —to correct.

THE COURT: Yeah, so there were some issues. All right. How about the defense?

[DEFENSE COUNSEL]: Your Honor, Mr. Roman-Lopez has a few disagreements or corrections with the PSI. The primary of note that he would like the Court to be aware of is on page 7, and I believe that's under prior record comments, the last few paragraphs above family history. Mr. Roman-Lopez disagrees with the wording and indicates some information about him refusing to be moved to essentially a lower security dorm a few times. He just wants the Court to know that, one, he is in the dorms now. I'm sure the Court is aware, they can see he's an inmate worker. So he's in the more lower security dormitories now. He just indicates that if he was asked to move to the dorms, it was a miscommunication. He was unaware of ever being made that offer when he— immediately when he qualified, he moved to the dorms.

THE COURT: *All right.*

[DEFENSE COUNSEL]: So he has that correction, and if I may have just one moment to make sure I'm not missing any other major correction at the moment. Your Honor, I believe any other issue may be a disagreement with the facts of the case. I think that's our only correction of fact.

THE COURT: *All right.* Will there be testimony by the State?

[THE STATE]: No, Your Honor. But I would let you know that [], the victim, is here.

THE COURT: Does she wish to make a statement?

[THE STATE]: She doesn't.

THE COURT: Okay. Any testimony by the defense?

[DEFENSE COUNSEL]: No, Your Honor, just argument and a statement from Mr. Roman-Lopez.

(Alterations and emphasis added.)

After argument as to sentencing, Roman-Lopez made a statement and asked for probation instead of an imposed sentence—but he did not provide any testimony to rebut the information

he challenged as inaccurate or unreliable in the PSI. As reflected by the PSI in the record, the district court did not redline the information Roman-Lopez challenged.

"When considering a PSI, the sentencing court has two distinct obligations. First, the court must reject consideration of inaccurate, unfounded, or unreliable information in the PSI." *Granger*, 170 Idaho at __, 508 P.3d at 340. "Second, the court must redline from the PSI information it is excluding as inaccurate or unreliable." *Id*. "This procedure not only ensures a clear record for review but also protects the defendant against misuse of the unreliable information in the future." *State v. Rodriguez*, 132 Idaho 261, 262 n.1, 971 P.2d 327, 328 n.1 (Ct. App. 1998). However, before the sentencing court can run afoul of these obligations, a defendant must meet four requirements. *See Granger*, 170 Idaho at __, 508 P.3d at 340–42.

First, the defendant "must specifically identify the information in the PSI claimed to be inaccurate, unfounded, or unreliable." *Id*. at __, 508 P.3d at 340. This requirement is satisfied if the defendant does so through an objection, a motion to strike, or in response to the sentencing court's inquiry of the parties to identify any proposed corrections. *Id*.

Second, a defendant "must demonstrate the challenged information is inaccurate, unfounded, or unreliable." *Id*. at __, 508 P.3d at 341. If the challenged information is facially speculative or unreliable, it should generally be stricken "absent an explanation from the presentence investigator" explaining why it is not speculative or is reliable. *Id*. If the information is facially reliable, "the defendant may present evidence during the sentencing hearing to support the assertion the challenged information is inaccurate or unreliable." *Id*. To satisfy this requirement, a defendant may offer "his own rebuttal to the disputed information" or subpoena "the sources of the disputed information for cross-examination." *Id*. The sentencing court "is not required to strike or disregard information in the PSI simply because the defendant disputes the information." *Id*. Only when the sentencing court "determines the challenged information is inaccurate or unreliable does the duty to 'redline' the information in the PSI arise." *Id*. at __, 508 P.3d at 340–41.

"Third, the defendant must obtain a definitive ruling from the sentencing court determining whether such information is or is not inaccurate or unreliable." *Id*. at __, 508 P.3d at 341. For example, when a defendant brings a challenge on appeal that the sentencing court improperly failed to redline the PSI, "the record must reveal an adverse ruling that forms the basis for assignment of error." *Id*. at __, 508 P.3d at 342.

"Finally, the defendant has the burden to ensure the sentencing court appropriately documented its rulings on the PSI in the record—both for purposes of appeal and of future distribution of the PSI." *Id*. This serves the well-settled rule that "[i]n the absence of an adequate record on appeal, an appellate court will not presume error." *Hall*, 163 Idaho at 832, 419 P.3d at 1130 (alteration added).

When these requirements are applied to Roman-Lopez's redlining request, his challenge is without merit. As to the first requirement, Roman-Lopez did identify the information in the PSI that he challenged as incorrect. However, as to the second requirement, Roman-Lopez did not carry his burden to demonstrate the facially reliable information in the PSI was incorrect. Indeed, Roman-Lopez placed no evidence before the district court—by way of his own testimony or other evidence—so that the district court *could* find in his favor and accept his correction.

When we turn to the third requirement, Roman-Lopez also failed to obtain a definitive adverse ruling from the district court on his proposed correction. Instead, Roman-Lopez contends the district court unequivocally "accepted" his proposed correction. The record does not bear this out. After Roman-Lopez made his proposed correction, the district court simply replied, "All right." This is not enough to show the district court "accepted" his proposed correction, or that the district court ruled adversely to it. Roman-Lopez heavily relies on a sentencing court's use of "all right" in *State v. Golden*, 167 Idaho 509, 473 P.3d 377 (Ct. App. 2020) to support his contention that "all right" means the district court in this case "accepted" his proposed corrections. However, Roman-Lopez's reliance on *Golden* is misplaced.

In *Golden*, the sentencing court solicited corrections to a PSI, and in response to corrections proposed by defense counsel, the court replied "all right" as it looked at a copy of that PSI. 167 Idaho at 512, 473 P.3d at 380. Regarding one of the proposed corrections, the prosecutor agreed that the PSI incorrectly included an attempted murder charge and acquittal related to a different person with the same name as Golden. *Id*. In addition, before defense counsel began listing proposed corrections, the sentencing court said, "All right. Just let me know which page so I can note the changes on the record." *Id*. However, on appeal, the record did not reflect those changes. *Id*. The Court of Appeals remanded the case so that the sentencing court could make the changes it clearly intended to make (and, indeed, seemed to make on a hard copy of the PSI according to the Court of Appeals). *Id*. Contrary to Roman-Lopez's suggestion,

23

the use of "all right" by the sentencing court in *Golden* does not thereby transform the use of "all right" by the district court in this case into an acceptance of his proposed corrections. Instead, as the Court of Appeals recently clarified, *Golden* is an example of a case where "changes obviously ordered by the court" did not appear in the appellate record. *Granger*, 170 Idaho at __, 508 P.3d at 342.

In sum, Roman-Lopez has not shown the district court's duty to redline was triggered and that it erred in not redlining his proposed corrections. Instead, the district court acted consistently with the standards applicable to the choices available to it when it heard Roman-Lopez's proposed corrections, and in the absence of any supporting evidence from Roman-Lopez, it did not redline the PSI or rule on his proposed corrections. Thus, Roman-Lopez is not entitled to a remand on this issue because he has not shown that the district court abused its discretion.

## IV. CONCLUSION

For the reasons discussed above, Roman-Lopez's judgment of conviction is affirmed.

Chief Justice BEVAN, and Justices STEGNER, MOELLER, and ZAHN, CONCUR.

24